THE UNION PACIFIC RAILWAY COMPANY v. THOMAS J. STERNBERGH, *as Administrator of the estate of Charles W. Brown, deceased.*

1. SPECIAL FINDINGS — *Inconsistency* — *New Trial.* Where important special questions are not fairly nor correctly answered by the jury, and some of the special findings made are unsupported by the testimony and inconsistent with each other, the general verdict should be set aside, and a new trial granted.

2. NEGLIGENCE — *Evidence* — *Jury.* The testimony with reference to the negligence of the railroad company in causing the injury of which complaint was made, examined, and it is *held*, that it was sufficient to take the case to the jury.

*Error from Douglas District Court.*

ACTION to recover for the death of Charles W. Brown, who was killed in a wreck on the Union Pacific railway, near the junction, at Lawrence, of the Leavenworth branch with the main line. The action is brought by Thomas J. Sternbergh, as administrator, for the benefit of Charles F. Brown, who was the son and only heir of Charles W. Brown. It is alleged that, under the direction of the company, a train of cars was sent from Wamego to Lansing, for the purpose of obtaining coal, and that they were required to go over the main line to the Lawrence junction, and from there to Lansing over the Leavenworth branch, making it necessary to pass over about 25 miles of the branch line in the nighttime. It is alleged that the company was negligent in failing to provide a suitable switch to connect the branch line with the main line at the junction point, and had also failed to provide proper signals or signs indicating the approach to the point of junction; and, further, that the agents and servants who directed and controlled the train were unskillful and negligent in its management, so that the train was run through an open switch at the junction and wrecked, whereby Brown, a brakeman, was instantly killed. The answer of the company was a general denial, and a further defense was that Brown was injured and killed through his own fault and negligence. The general

verdict was rendered against the company for $3,000, and among other special findings of fact the following were returned:

"Q. 1. Was Charles W. Brown guilty of any negligence which caused the wreck in which he lost his life? If so, state what it was. A. No.

"Q. 2. Was Charles W. Brown, at and just before the time of his death, willing to support his wife and son? A. Yes.

"Q. 3. Did Charles W. Brown ever abandon his son, Charles F. Brown? A. No.

"Q. 4. What was Charles W. Brown's age at the time of his death? A. 47 years.

"Q. 5. Was he a sober and industrious and healthy man at the time of his death? A. He was.

"Q. 6. Has Lucy A. Brown, the wife of Charles W. Brown, died since the commencement of this suit? A. Yes.

" Q. 7. Was Leonard, the conductor of the train on which Brown was killed, guilty of any negligence at the time? If so, state what act of negligence he was guilty of. A. Yes; in not holding train on down grade.

" Q. 8. Was brakeman McKisson guilty of any negligence at the time Brown was killed? If so, state of what negligence he was guilty. A. No.

"Q. 9. Was engineer Monden guilty of any negligence at the time Brown was killed? If so, state of what act of negligence he was guilty. A. Yes; in not holding his train on down grade, and nearing junction.

"Q. 10. Was fireman Chase guilty of any negligence at the time Brown was killed? If so, state of what act of negligence he was guilty. A. No.

" Q. 11. Was the wreck in which Brown was killed the proximate result of any act of negligence of the defendant? If so, state the act of negligence which was the cause of the wreck, and the name of the employé who committed such act of negligence. A. Yes; Leonard and Monden.

" Q. 12. Was brakeman Brown, at the time he was killed, either by himself or in connection with the other employés on the train, guilty of any act of negligence which caused the wreck? If so, state what such negligence was. A. No.

"Q. 13. Was Brown living with his wife and son at the time of his death? If not, state for about how long prior to his death he had not been living with them. A. No; about four or five years.

" Q. 14. Was Brown supporting his wife and son at the time of his death?    A.  Do not know.

"Q. 15. Is it not a fact that Brown had not been supporting his wife and son for about four or five years before his death; or if he had not failed to support them for that length of time, state for about how long before his death he had not supported them?    A.  Do not know.

"Q. 16. Was not Brown's wife living with and being supported by other men for several years before his death?    A. At times she was.

"Q. 17. Was not Brown's son, Charley, supporting himself by selling wienerwurst for a year or more before Brown was killed?    A.  Yes.

"Q. 18. How much, if anything, did Brown contribute to the support of his wife and son from the time they quit living on Dripp street, in Kansas City, until his death; and if any such contribution was made, when was it made? A.  Do not know as to his wife; gave son a complete outfit, hat, clothes, shoes, socks, and shirts, and underwear, and $4 or $5 in money, about six or seven months before he was killed.

"Q. 19. Did not Brown abandon his wife and son when they were living on Dripp street, in Kansas City?  A.  No."

"Q. 21. Is it not true that at the time of Brown's death his life was worth nothing in money to his wife and son? A.  No."

Upon a motion for a new trial, it was insisted that the verdict was against the evidence, that the damages allowed were grossly excessive, and that the special findings were inconsistent with each other, and were unsupported by the testimony, but the motion was overruled, the verdict approved, and judgment rendered against the company.   Upon these rulings, errors are assigned.

*A. L. Williams, N. H. Loomis,* and *R. W. Blair,* for plaintiff in error:

There was no proof of negligence on the part of the railroad company.   The only negligence found by the jury was that Leonard, the conductor, did not hold the train going down grade, and that the engineer, Monden, did not hold the train on down grade on nearing the junction.   The only testimony upon which the negligence of Leonard and Monden

could be based was the deposition of Leonard himself, and that of McKisson, who was a brakeman on the train; and there is absolutely no testimony tending to show any negligence on the part of Leonard. All the evidence in the case showing how the train was operated at the time of the accident, or by any possibility having any bearing upon the question of negligence, being by deposition, this court is as competent and has as much right to weigh it as the trial court. *Durham v. C. C. & M. Co.*, 22 Kas. 232.

If the court shall decide that Monden was guilty of negligence, still the verdict ought to be set aside, because the jury have found that both Leonard and Monden were guilty of negligence, and they may have based their verdict upon the supposed negligence of Leonard, thinking that the negligence of Monden, if any there was, was slight; and it is possible that their general verdict would have been for the defendant if they had not supposed that Leonard was guilty of negligence. There being absolutely no negligence on the part of Leonard, the verdict ought not to be allowed to stand.

The general verdict is against the evidence, and is grossly excessive, and some of the special findings are against the evidence, and others are not supported by sufficient evidence.

Compensation should have been made to the son only for the actual loss sustained; and if the evidence did not show a loss, no compensation was due. See *A. T. & S. F. Rld. Co. v. Brown*, 26 Kas. 443; *A. T. & S. F. Rld. Co. v. Weber*, 33 id. 543; *A. T. & S. F. Rld. Co. v. Brown*, 33 Kas. 757.

This court has never hesitated to set aside a verdict when excessive. Beginning with *Swartzel v. Dey*, 3 Kas. 244, and coming down to the present we find an unbroken line of decisions on that point. See, also, *Ladd v. Foster*, 31 Fed. Rep. 827.

*Riggs & Nevison*, for defendant in error:

The answers to questions 7, 9, and 11, submitted to the jury by the plaintiff below, are directly upon the question of the negligence of the railroad company. The rule is held

in this court that where a question of fact is submitted to a jury and there is competent evidence tending to establish such fact, the findings of the jury and the verdict thereon, when approved by the trial court, are conclusive. *Gafford v. Hall,* 39 Kas. 166; *Cavender v. Fair,* 40 id. 182; *Juneau v. Stunkle,* 40 id. 756.

The claim of plaintiff in error that the general verdict is against the evidence, and that the damages are grossly excessive, is based upon a narrow, illiberal and unfair interpretation of the evidence, and one which no fair-minded jury could adopt. The circumstances surrounding this family were such as to make it impossible to present to the jury anything like its full history; but we submit that enough appeared in evidence to enable them to form a reasonable estimate of the value of the life of Charles W. Brown and the loss which his son and only heir sustained in his death. These questions were peculiarly within the province of the jury, and while we recognize the right and power of the court to set aside a verdict as excessive in certain cases, such power should be exercised only when gross injustice is done by the verdict.

"A court cannot interfere with the verdict of a jury on the ground of excessive damages, unless the damages are so excessive as to lead to the conclusion that the same is the fruit of passion or prejudice. To warrant a conclusion of that kind the award of damages must be shocking to the sense of justice."

See *Dugert v. Railroad Co.,* 52 Fed. Rep. 87; *Treffert v. Railroad Co.,* 36 Ill. App. 93. See, also, *Barry v. Edmunds,* 116 U. S. 565.

There is no arbitrary rule for computing the value of life taken away. See *K. P. Rly. Co. v. Cutter,* 19 Kas. 83; *I. C. Rld. Co. v. Barron,* 5 Wall. 90. The rule laid down in *A. T. & S. F. Rld. Co. v. Brown,* 26 Kas. 443, which is invoked by plaintiff in error, is not applicable to this case. In fact, this court, in that case, distinguishes between that case and this. We believe the true rule which governs the jury in

such cases is laid down by the New York courts in the following language:

"The fact that the next of kin are not able to show any direct specific pecuniary loss arising from the death of a person by negligent act does not affect their right to recover; but the character, quality, condition and circumstances both of deceased and of the next of kin are to be considered, and the best estimate possible made therefrom. The proof may be unsatisfactory and the damages may be quite uncertain and contingent, yet the jurors in each case must take the elements thus furnished and make the best estimate of damages they can."

See *Lustig v. Railroad Co.*, 65 Hun, 547; same case, 20 N. Y. Supp. 477; *Lockwood v. Railroad Co.*, 93 N. Y. 523.

The opinion of the court was delivered by

JOHNSTON, J.: The accident causing the injury for which a recovery is sought occurred at the junction of the Leavenworth branch with the main line of the Union Pacific railway, near Lawrence. The crew was directed by the company to go from Wamego to Lansing for a train of coal, and in accordance with the order they went there, passing over the line in the daytime. Those in charge of the train were Leonard, conductor; Monden, engineer; Chase, fireman; Brown, head brakeman; and McKisson, rear brakeman. They obtained their load at Lansing, and late in the evening they started on their return trip, stopping at several stations on the branch. The approach to the junction with the main line is a down grade about three miles long; and when they were within about a mile of the junction the conductor, with the aid of the rear brakeman, set the brake of the caboose. Afterward, when they were within about a quarter of a mile of the junction, the conductor noticed that the train was running at a rate of about 18 miles an hour, and that the engineer was not applying the air brakes or slackening the speed of the train. He then took his lantern and signaled the engineer to stop; but the signals were not heeded, and no effort

was made by the engineer to apply the air brakes or to slacken the speed until a few moments before the junction was reached. The switch at the junction being closed, the train was derailed, and Brown was thereby instantly killed. While there were several grounds of negligence alleged, the jury have found that the accident was the result of the negligence of Leonard and Monden, in not holding the train on the down grade nearing the junction, and have thereby excluded all negligence alleged, or about which testimony was offered, except that of these two employés.

It is insisted by the railway company that the testimony fails to establish the negligence of these employés, and that for that reason the verdict ought not to be allowed to stand. It is difficult to find any testimony in the record showing culpable negligence on the part of the conductor. The engine and five of the cars were equipped with air brakes, and, according to the testimony, it is the duty of the engineer to control or stop the train by the use of these brakes at a station or junction without any signal from the conductor. If, from any cause, the brakes fail to work, he should then signal the trainmen in time for them to stop the train by hand brakes. Leonard states that there was nothing in the management of the train to indicate that the engineer was not watchful, and in full control of his train, until they were within a quarter of a mile of the junction, when he endeavored to signal the engineer and to stop the train. While the testimony of the conductor and the rear brakeman tends strongly to relieve the conductor of the charge of negligence, it was still a question for the jury to determine whether, in view of his knowledge of the road, the down grade, and the rate of speed upon which they were running, he should not have made earlier efforts to have stopped the train by signals and the setting of brakes.

As to the engineer, there can be little doubt of his negligence. It is true that this was his first trip over the Leavenworth branch, but only a few hours before he had passed over the line, and knew the character of the connection be-

tween the branch and the main line. It was the duty of the
engineer to pay attention to the landmarks, and particularly
when running over a railroad with which he was not familiar.
( *U. P. Rly. Co. v. Monden,* 50 Kas. 539.) It was also his duty
to look back occasionally to see that the train was all right,
or for any signal which the conductor might give. If he had
kept a lookout he would have discovered the signals given by
the conductor, and probably in time to have stopped the
train. He was at least aware that he was on the down grade
leading to the junction, and that a stop must be made, and
the switch opened to let the train upon the main track. Be-
sides the ordinary landmarks, which were near the track, the
electric lights of Lawrence and Bismarck Grove were plainly
apparent to any observer, and why they were not seen or did
not arrest his attention, if he was awake, is hard
to understand. We think the testimony clearly
establishes the negligence of Monden, and hence
it cannot be said that the verdict is unsupported in that re-
spect.

2. Negligence—
    evidence—
    jury.

The next contention is, that the amount awarded as dam-
ages is grossly excessive. In view of the history of the de-
ceased, and of his relations to his family, the award was
exceedingly liberal. Brown was married to Mrs. Ralston, a
divorced woman, in Mexico, Mo., in 1873, and they lived
together until 1882, when a separation occurred. A child
was born to them, and he was about nine years of age at the
time of the separation. They were living in Kansas City
when he discarded his wife, and there is nothing to show that
he ever afterward contributed anything toward her support.
From the time he forsook her and the child, she led an aban-
doned and dissolute life. Some of the time she was in a
house of ill fame, and she lived in adulterous relations with a
number of men in Kansas City. Part of the time she lived
as the mistress of a newsdealer, then of a saloon keeper, and,
finally, of an Italian fruit vender. It appears that she was
addicted to the use of strong drink, and that she reached a very
low condition. The boy was permitted to live with her during

27—54 KAS.

that time, and follow her from place to place throughout her dissolute life. It is shown that he was a bright and energetic boy, for he sold papers and "wienerwurst," sometimes earning as much as $2 and $3 a day, most of which was given to his mother.

The father was 47 years of age at the time of his death, and was earning from $50 to $75 per month. It appears that he had accumulated no property, and although he was aware that his wife, with whom the boy lived, was leading a life of shame, he allowed the boy to remain with and follow her through all her vice and degradation. During this time he showed no concern about the family, nor did he visit them but once, which was in the fall or winter preceding his death; and at that time he found his wife living in adulterous relations with a saloon keeper, and then he gave the boy some clothing and about $4 or $5 in money. Outside of this single instance, it does not appear that he ever shared his earnings with the family, or contributed anything toward their support. From that time until his death, he showed no interest in either wife or son, and they did not hear from him until they were informed that he had been accidentally killed. What beneficial interest did the son have in his life, and what was the pecuniary loss suffered by his death? As the jury were informed, the law must give to the child only the amount of his pecuniary loss. Nothing is allowed for the suffering of the deceased nor for the sorrow of those he left, but just the value to the child of his life, in money.

In determining what would be the probable value of the life of the deceased to his son, regard must be had to what he had done in the past toward the support and maintenance of the son, and what, considering his habits and disposition, he would be likely to do in the future. If, according to the law of human probability and experience, the life of the decedent, if continued in existence, would bring little gain to the son, little compensation can be given for its loss. There is always considerable difficulty in fixing the pecuniary value of any human life to the next of kin, and necessarily there is

great uncertainty as to the amount of damages which should be awarded. Mr. Justice BREWER, however, in a somewhat similar case, remarked that —

"In determining what would be the probable value of that life to her, regard must be had to what he had done in the past toward her support and maintenance, and what, considering her means and his earnings, as well as his habits and disposition, he would be likely to do in the future. It is not fair to say that all his surplus earnings would go to her, because that is not the law of human experience." (*A. T. & S. F. Rld. Co. v. Brown,* 26 Kas. 459.)

Judging the future by the past, the life of Brown, if he had lived, would have been of but little value to his son. When the boy stood in greatest need of his father's care, he allowed him to live in the haunts of vice, surrounded by influences of the most contaminating character. He had not accumulated any property, nor had he shared his earnings with his son, except in the single instance referred to. From that time he was not seen nor heard of by the son until his death was reported. The son was over 13 years of age at the death of the father, and over 15 years at the time of the trial, and it was shown that for some time the earnings of the son exceeded those of the father in his lifetime. It is true that in cases of this kind there is no precise rule upon which to determine the pecuniary loss, and therefore that it must rest largely upon the good sense and sound judgment of the jury; but, in view of all the testimony, the amount awarded in this case was very large. Whether it is so excessive as of itself to require a reversal need not be decided. The special questions submitted to the jury were not fairly and truthfully answered, and for this reason the judgment and verdict cannot be sustained.

In answer to the second question, the jury replied that Brown, at and just before the time of his death, was willing to support his wife and son. The testimony does not sustain this answer. Nor was the third fairly answered, where it was stated that Brown never abandoned his son. In answer

to the fourteenth question — whether Brown was supporting his wife and son at the time of his death — the jury answered that they did not know, when the testimony clearly showed that he was not giving them any support at that time. In the same connection, the jury stated that the boy had been supporting himself for a year or more before Brown was killed. The answers do not accord with the testimony, are inconsistent with each other, and indicate either that the testimony was not properly understood, or that the jury was unwilling to fairly answer the questions submitted. The judgment will be reversed, and the cause remanded for another trial.

1. Special findings—inconsistency—new trial.

All the Justices concurring.